# United States District Court

## For The District of Wyoming

| | | |
|---|---|---|
| PHILLIP CHARLES BARHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No. 10–CV–261–D |
| TOWN OF GREYBULL WYOMING, | ) | |
| GREYBULL POLICE DEPARTMENT, | ) | |
| POLICE CHIEF BILL BRENNER | ) | |
| individually, POLICE OFFICER MATT | ) | |
| MILLER individually, AND POLICE | ) | |
| OFFICER BEN MAYLAND, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The above-entitled matter comes before the Court on two related motions: (1) *Peace Officer Defendants' Motion for Judgment on the Pleadings*, Doc. 20; and (2) *Motion for Judgment on the Pleadings Pursuant to Rule 12(c), Fed.R.Civ.P. by Defendants Town of Greybull, Wyoming and Greybull Police Department*, Doc. 22. On May 11, 2011, the Court held a hearing on the motions. James P. Castberg of Sheridan, Wyoming appeared on behalf of Plaintiff. Larry B. Jones and Tenille L. Castle of Cody, Wyoming appeared on behalf of Defendants, Town of Greybull, Wyoming and the Greybull Police Department. Theodore R. Racines of Cheyenne, Wyoming appeared on behalf of Defendants Police Chief Bill Brenner, Police Officer Matt Miller, and Police Officer Ben

1

Mayland. The Court, having carefully considered the motions, response, and exhibits thereto, including Plaintiff's supplement of the record, and arguments made by the parties at the hearing, and being fully advised in the premises, FINDS and ORDERS:

## I.      BACKGROUND

On July 27, 2009, the mother of a Greybull, Wyoming girl, T.S., contacted Deputy Elder[1] with the Big Horn County Sheriff's Office and reported that her daughter, D.S., who is thirteen years old, had made a disclosure during a therapy session at the Wyoming Behavioral Institute ("WBI"), that she had been sexually assaulted by a man named Charlie, later determined to be Phillip Charles Barham. (Doc. 21-1). Thereafter, Deputy Elder and Sergeant Miller, with the Greybull Police Department, with permission from T.S., interviewed D.S. at WBI in Casper, Wyoming. During the interview, D.S. verified that the man she referred to as Charlie was in fact Phillip C. Barham, and she accused Phillip Barham of having sex with her on multiple occasions some of which were at his home. D.S. drew a map of where Barham lived and described his house, including the interior. Sergeant Miller was familiar with Barham's house and noted that the description as given by D.S. was accurate. Based on the information given by D.S. in her interview, on July 29, 2009, officers with the Greybull Police Department arrested Plaintiff pursuant to an arrest warrant issued by the Circuit Court of Big Horn County, Wyoming. The Information accompanying the warrant charged

---

[1]Deputy "Edeler" is referred to in the affidavits (Doc. 21-1, 21-2, 21-9) however, Defendants' Memorandum refers to him as "Elder." (Doc. 21). It is unclear which spelling is correct so to avoid confusion this Court will use the spelling of "Edeler".

Plaintiff with eight counts of sexual assault of a minor.

In investigating the charges related to D.S., officers obtained information indicating that Plaintiff may have sexually assaulted two other adult women, a woman named D.J. and D.S.'s mother, T.S. Based on the separate statements given by these two women, on August 7, 2009, Plaintiff was further charged with committing additional sexual assaults. In total, a total of twenty counts were brought, by criminal information, against Plaintiff.

Based on the statements given by each of the alleged victims, Defendant Police Sergeant Matt Miller swore out the affidavits for the three arrest warrants, as well as the search warrants for Plaintiff's person, residence, and vehicle. All of the warrants were issued by Wyoming Circuit Court Judge Thomas W. Harrington. Nineteen of the twenty charges were bound over to the District Court after the Circuit Court held preliminary hearings in August of 2009. Plaintiff was detained in the Big Horn County Detention Center for 224 days while his case was investigated.[2] Ultimately, in March, 2010, the County Attorney dismissed the charges, without prejudice.

Plaintiff filed his Complaint in this matter on December 2, 2010, bringing claims against Defendants for **(1)** unlawful arrest and unlawful detention in violation of his civil rights, pursuant to 42 U.S.C. § 1983; **(2)** unlawful search and seizure; **(3)** excessive force causing physical injury during arrest; and **(4)** public embarrassment, ridicule, and loss of enjoyment of life.

---

[2] Plaintiff stresses that for his own personal safety reasons, most of his incarceration in the Big Horn County Detention Center was spent in solitary confinement.

## II.    PROCEDURAL STANDARD

Defendants filed the motions for judgment on the pleadings, based on Federal Rule of Civil Procedure 12(c), on April 11, 2011.  Docs. 20 and 22.  Plaintiff timely filed his responses on April 26, 2011.  Docs. 28 and 29.  Because the parties submitted multiple exhibits, the Court finds the procedural posture in determining this matter renders it impossible for the Court to consider it as a Rule 12(c) dismissal.  In their motions, Defendants ask the Court to consider several attached documents, including:[3]  **(1)** Arrest Affidavit for Plaintiff, Case No. 09G–04, dated July 29, 2007 (Doc. 21–1, Exhibit A and Doc. 30–1, Exhibit No. 2); **(2)** Affidavit for Search Warrant of Plaintiff's Premises and Warrant for Search and Seizure, Criminal No. SW–2009–0004B, dated July 29, 2009 (Doc. 21-2, Exhibit B); **(3)** Information, Criminal No. CR–2009–0035B, dated July 29, 2009 (Doc. 21–3, Exhibit C and Doc. 30–1, Exhibit No. 2); **(4)** Warrant for Plaintiff's Arrest, Criminal No. CR–2009–0035B, dated July 29, 2009 (Doc. 21–4, Exhibit D and Doc. 30–1, Exhibit No. 4); **(5)** Affidavit for Search Warrant of Plaintiff's premises and Warrant for Search and Seizure, Criminal No. SW–2009–0003B, dated July 30, 2009 (Doc. 21–5, Exhibit E); **(6)** Arrest Affidavit for Plaintiff, Case No. 09G–104, dated August 4th, 2009 (Doc. 21–6, Exhibit F and Doc. 30–1, Exhibit No. 4); **(7)** Information, Criminal No. CR–2009–0036B, dated August 7, 2009 (Doc. 21–7, Exhibit G and Doc. 30–1, Exhibit No. 4); **(8)** Warrant for Plaintiff's arrest, CR–2009–0036B, dated August 7, 2009 (Doc. 21–8, Exhibit H); **(9)** Affidavit for Search Warrant of Plaintiff's Premises and Vehicle and

---

[3] Most of the exhibits submitted by the parties are identical documents and have been cited accordingly.

4

Warrant for Search and Seizure, Criminal No. SW–2009–0005B, dated August 2, 2009 (Doc. 21–9, Exhibit I); **(10)** Arrest Affidavit for Plaintiff, Case No. 09G–104, dated August 5, 2009 (Doc. 21–10, Exhibit J); **(11)** Affidavit of David R. Chavez, M.D., dated November 30, 2009 (Doc. 21–11, Exhibit K and Doc. 30–1, Exhibit No. 3); **(12)** Motion for Order to Show Cause, filed by Plaintiff on August 9, 2010 in the Fifth Judicial District, Big Horn County, Wyoming (Doc. 21–12, Exhibit L); **(13)** Arraignment, Docket Entry, and Judgment for Plaintiff, Case No. CR–2009–0035B, dated August 10, 2009 (Doc. 21–13, Exhibit M); **(14)** Arraignment, Docket Entry, and Judgment for Plaintiff, Case No. CR–2009–0036B, dated August 19, 2009 (Doc. 21–14, Exhibit N); **(15)** Wyoming Attorney General Division of Criminal Investigation, Laboratory Examination Report, dated March 1, 2010 (Doc. 30–1, Exhibit No. 5); and **(16)** Wyoming Attorney General Division of Criminal Investigation, Laboratory Examination Report, dated March 4, 2010 (Doc. 30–1, Exhibit No. 6).

Rule 12(c) provides that "after the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). A motion for judgment on the pleadings implicates essentially the same legal principles as a Rule 12(b) motion to dismiss. *See generally Continental Coal, Inc. v. Cunningham*, 511 F.Supp.2d 1065, 1070 (D. Kan. 2007). Except in very limited circumstances, in determining a motion for judgment on the pleadings, the Court is limited to the allegations pled within the four corners of the Complaint. *See e.g. Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); *Burnham v. Humphrey Hospitality Reit Trust Inc.*, 403 F.3d 709, 713 (10th Cir. 2005) (stating that on a Rule 12(b)(6) motion, a court's factual inquiry is limited to the well-pleaded facts contained in the complaint). Thus, the Court may grant a motion

for judgment on the pleadings if all material issues can be resolved solely on the pleadings. However, the Court finds it necessary to also consider the exhibits attached by parties in making a determination.

"If, on a motion under Rule 12(b)(6) or 12(c) matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). Consequently, when a party attaches exhibits to a Rule 12(c) motion, the Court generally must convert the motion into a motion for summary judgment because exhibits, such as those filed here, are not considered pleadings under the Federal Rules.[4] *See* Fed.R.Civ.P. 12(c) and Fed.R.Civ.P. 7 (delineating between pleadings, motions, and other papers). *Tal v. Hogan*, 453 F.3d 1244, 1265 (10th Cir. 2006) ("Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence."). Therefore, the Court finds it necessary to convert Defendants' motions to summary judgment.[5]

The Court is mindful that in converting a motion to dismiss to a motion for summary

---

[4] The Court notes that qualified immunity is normally raised on a motion for summary judgment. *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

[5] The Court understands it may consider documents that are attached to the complaint, incorporated by reference, or referred to in the complaint and that are central to the plaintiff's allegations. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941-42 (10th Cir. 2002). However, Plaintiff has not attached, nor incorporated any of the exhibits into his Complaint. And, although much of his Complaint is a recital of the information contained in the exhibits, Plaintiff only generally mentioned the affidavits in his pleading. Thus, to err on the side of caution, the Court, after notice to the parties, converted Defendants' Rule 12(c) motions to motions summary judgment.

judgment, it must provide the parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). The Court notified the parties of its decision to convert the motions at the May 11, 2011 hearing and provided them ten (10) days to submit any additional exhibits they wished the Court to consider. Doc. 34. On May 23, 2011, Plaintiff supplemented the record with the following: **(1)** an audio recording of Plaintiff's Preliminary Hearing, dated August 19, 2009[6]; **(2)** a transcript of Plaintiff's Arraignment Proceedings, dated October 6, 2009; and **(3)** a transcript of Plaintiff's Motion for Bond Reduction Proceedings, dated February 2, 2010.

## III.    LEGAL ANALYSIS

## (a)    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue of material fact to be resolved at trial. Fed. R. Civ. P. 56(c); *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993). Thus, the Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Nelson v. Geringer*, 295 F.3d 1082, 1086 (10th Cir. 2002). "An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment." *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797

---

[6] Plaintiff submitted two audio discs with his supplement, one dated August 10, 2009 and one dated August 19, 2009. This Court, in review of the audio recordings, notes that both audio recordings submitted are from the same hearing, Plaintiff's August 19, 2009 preliminary hearing, not two separate dates as marked on the audio disks.

(10th Cir. 1997).

In applying these standards, the Court must view the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996). The moving party bears the initial burden of demonstrating "the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has supported its motion for summary judgment, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). To do so, the non-moving party must go beyond the pleadings and designate specific facts to show there is a genuine issue. *Id.*; *Ford v. West*, 222 F.3d 767, 774 (10th Cir. 2000). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to create a "genuine" issue of disputed fact. *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997). However, where summary judgment is sought based upon qualified immunity, the summary judgment standards are subject to a somewhat different analysis from other summary judgment rulings. *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).

**(b)  QUALIFIED IMMUNITY & DEFENDANTS POLICE CHIEF BILL BRENNER, POLICE OFFICER MATTER MILLER and POLICE OFFICER BEN MAYLAND**

Qualified immunity shields public officials from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985).  Consequently, the qualified immunity defense must be resolved at the earliest possible stage of litigation.  *See Saucier v. Katz*, 533 U.S. 194 (2001).  The doctrine of qualified immunity "operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).  As governmental officials, Defendants are entitled to assert a defense of qualified immunity because:

> [g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Rozek v. Topolnicki*, 865 F.2d 1154, 1157 (10th Cir. 1989).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483 U.S. at 639.

Qualified immunity is an affirmative defense that the defendant has the burden of pleading. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  Once qualified immunity is properly raised, the burden shifts to the plaintiff to show that the defendant violated a specific statutory or constitutional right and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue. *See e.g.*, *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir.2006); *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009).  Because Defendants have raised the qualified immunity defense, the Court will focus on whether Plaintiff has met his burden of showing that Defendants violated a clearly established constitutional right.  To carry his burden of convincing the Court that the law was clearly established, Plaintiff "must do more than identify, in the abstract, a clearly established right and allege that the defendant has violated it."

9

*Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988) (*citing Anderson*, 483 U.S. at 639). This means Plaintiff must show that a reasonable official would understand that what he was doing violated Plaintiff's right. *See Pindell v. Wilson-McKee*, 60 F.Supp. 2d 1244, 1252 (D. Wyo. 1999).

### i. Warrant Affidavits

The first arrest affidavit and search warrant affidavit were both sworn to by Defendant Miller on July 29, 2009. Doc. 21, Peace Officer Exhibit A, *Arrest Affidavit*. These affidavits outline the sexual assault allegations brought by a thirteen year old girl, D.S. The affidavits, which read essentially the same, establish that on July 27, 2009, Defendant Miller was assigned to follow up on a report of sexual assault given to Defendant Police Chief Brenner. *Id.*, ¶ 2-3. D.S.'s mother had reported to Deputy Elder of the Big Horn County Sheriff's Department that D.S. had disclosed to her therapist that she had been sexually assaulted by a man named "Charlie," later discovered to be Plaintiff. *Id.*, ¶ 4. At the time, D.S. was at the Wyoming Behavioral Institute in Casper, Wyoming. *Id.* After seeking permission from D.S.'s mother, Deputy Elder interviewed D.S. at the Wyoming Behavioral Institute, at which time D.S. informed Deputy Elder that her Great Uncle, Craig Winstead, had been performing sexual acts on her since she was about eight years old.[7] *Id.*, ¶ 9. D.S. told Deputy Elder that Winstead had introduced Plaintiff to her and told him "that is was okay

---

[7] Craig Winstead was convicted for sexually assaulting D.S in 2007, along with two other children, and is currently serving consecutive sentences of 10 to 15 years on two counts of third degree sexual assault and a concurrent sentence of 10 to 15 on a third count third degree sexual assault, at the Wyoming State Penitentiary in Rawlins, Wyoming. *See Winstead v. State*, Supreme Court Case No. S-11-0069.

to have sexual intercourse with D.S. because Winstead already did so on a regular basis." *Id.*, ¶ 8. D.S. also told Deputy Elder that Winstead and Plaintiff would take turns having sexual intercourse with her and that when Winstead went to prison, Plaintiff continued to molest and have sex with her. *Id.*, ¶¶ 10-14. D.S. was very specific and graphic in recounting the details of the sexual assaults she alleged Plaintiff had performed on her. D.S. was also very specific in describing Plaintiff's residence, where the acts allegedly occurred, and even drew an accurate map of Plaintiff's property. *Id.*, ¶ 15. Based on D.S.'s statements, Defendant Miller believed that probable cause existed to obtain the warrants. *Id.*, ¶ 16. The circuit court judge agreed and issued the warrants for Plaintiff's arrest, search and seizure. *See* Doc. 21, Peace Officer Exhibit B, *Warrant for Search and Seizure*, at 4.

The second set of affidavits relate to the sexual assault allegations brought by D.J.[8] According to the D.J. Arrest Affidavit, while executing the search warrant in the D.S. matter, Defendant Miller discovered videos on one of Plaintiff's cell phones, wherein Plaintiff had asked a woman "to expose her breasts and vagina." Doc. 21, Peace Officer Exhibit F, *Arrest Affidavit*, ¶ 2-3. The cell phone also contained compromising pictures of the woman. *Id.* That woman was later recognized to be D.J. *Id.* Defendant Miller then went to D.J.'s house to inquire about Plaintiff. *Id.*, ¶ 6. As soon as Defendant Miller asked D.J. if she would talk to him about Plaintiff, she immediately began to cry and expressed fear of Plaintiff. *Id.* Only after Defendant Miller made clear

---

[8] The search warrant affidavit was sworn by Defendant Miller on July 30, 2009. The arrest warrant affidavit was sworn by Defendant Miller on August 4, 2009. The Affidavit for Search Warrant, Exhibit E, and the Arrest Affidavit, Exhibit F, contain substantially the same language.

that Plaintiff was in jail and would not be able to hurt her did D.J. agree to be interviewed. *Id.* D.J. told Defendant Miller that the day before she and a man named James Housler had gone to Plaintiff's house in order to earn some extra money cleaning out Plaintiff's shed. *Id.* After Housler left, D.J. set forth that Plaintiff told her to take some items from the shed and put them into the cellar of the empty house next door. *Id.* She claimed that Plaintiff followed her into the cellar, where he sexually assaulted her and then made her pose for him and touch herself while he videoed her with his cell phone. *Id.* ¶ 9. D.J. declared Plaintiff threatened to harm her if she told anyone about what happened in the cellar, saying "listen little girl, I have nine felonies and I won't hesitate to get one more." Doc. 1, ¶ 100.

Next, D.J. stated that Plaintiff told her to grab some paint cans from the cellar and take them over to his house. *Id.* She said that she did as she was told and that Plaintiff followed her. *Id.* She explained that she would have run, but she was afraid that Plaintiff would have caught her and hurt her. *Id.* D.J. told Defendant Miller that once inside Plaintiff's house, Plaintiff again sexually assaulted her. *Id.* D.J. insisted when she tried to fight Plaintiff off, he simply drug her to his bed in the living room where he tried to rape her. *Id.* Defendant Miller observed bruises on D.J.'s arms and legs that were consistent with her story. *Id.*, ¶ 10. *See also Audio Recording of Plaintiff's Preliminary Hearing*, dated August 19, 2009 at approximately 29:00 (testimony of Defendant Miller describing the bruising on D.J.'s arms, wherein he explained she had three small finger-sized bruises that were consistent with someone grabbing her arm). D.J. stated Plaintiff was unable to rape her because she fought him off, so he forced her to perform oral sex on him instead. *Id.*, ¶ 9. D.J. told

Defendant Miller that Plaintiff eventually ejaculated into her mouth and that his semen came out the side of her mouth, spilling onto either her shirt, Plaintiff's bed sheet, or Plaintiff. *Id.* D.J. relayed to Defendant Miller that after the assault, Plaintiff drove her home in his pickup truck. *Id.* Based on D.J.'s statements, Defendant Miller believed that probable cause existed to obtain the second set of warrants. *Id.*, ¶ 12. The circuit court judge again agreed and issued the warrants for the search and seizure of Plaintiff's person, residence, and vehicle. *See* Doc. 21, Peace Officer Exhibit E, *Warrant for Search and Seizure*, at 4.

The third set of affidavits related to sexual assault allegations brought by D.S.'s mother, T.S.[9] According to the arrest affidavit, during Defendant Miller's July 27, 2009 interview with T.S. concerning the allegations brought by D.S., T.S. informed him that Plaintiff had also sexually assaulted her the previous summer "sometime during the gardening season." Doc. 21, Peace Officer Exhibit J, *Arrest Affidavit*, ¶¶ 2-9. T.S. set forth that she had gone to Plaintiff's house to get some vegetables and when she arrived, Plaintiff invited her inside, at which time he sexually assaulted her. *Id.*, ¶¶ 10-20. T.S. claimed Plaintiff forced her to perform oral sex on him and that after he ejaculated into her mouth, she vomited. *Id.* T.S. further advanced that afterward Plaintiff began to masturbate in front of her using Vaseline and ordered her to take her clothes off. *Id.* T.S. stated that at that point, Plaintiff forced her to have sex with him. *Id.* T.S. insisted Plaintiff held a handgun

---

[9] The search warrant affidavit was sworn by Defendant Miller on August 2, 2009. The arrest affidavit was sworn by Defendant Miller on August 5, 2009. The Court notes that the Affidavit for Search Warrant, Exhibit I, and the Arrest Affidavit, Exhibit J, contain substantially the same language.

throughout the entire incident, which is why she complied with his demands. *Id.* T.S. fastidiously explained the gun to Defendant Miller, stating it was a revolver style with a four-inch barrel and probably silver in color. *Id.*, ¶ 21. T.S. also described a brown couch in Plaintiff's living room. T.S. also insisted that since the assault, Plaintiff frequently threatened her with physical harm so she would not tell anyone about the incident. *Id.* Based on T.S.'s statements, Defendant Miller believed that probable cause existed to obtain the third set of warrants. *Id.*, ¶ 24. The circuit court judge agreed and issued the warrant for the search and seizure of Plaintiff's residence and vehicle. *See* Doc. 21, Peace Officer Exhibit I, *Warrant for Search and Seizure*, at 4.

### ii. Plaintiff's Fourth Amendment Claims for Unlawful Arrest, Unlawful Detention, and Unlawful Search and Seizure

Plaintiff claims his arrest, detention, and the search and seizure of his residence and property violated his Fourth Amendment rights because there was insufficient probable cause to support Defendant Miller's affidavits, the issuance of the warrants, and to support the charges against him. Plaintiff asserts Defendants' handling of the case amount to "such a degree of incompetence that they are not, and should not, be entitled to qualified immunity." Doc. 30, at 24.

Police Officer Defendants, on the other hand, assert the three arrest affidavits, along with the three search warrants, each establish probable cause to believe that Plaintiff committed the assaults against the three alleged victims. Doc. 21, at 9–13. These Defendants point out that the affidavits describe what the alleged victims told police officers during their interviews and that there are no allegations that Defendant Miller included any false information in any of them. *Id.* at 15. At the

hearing, Police Officer Defendants argued Plaintiff's allegations create reasonable doubt, which would be appropriate if this were a criminal trial and he were trying to convince a jury of his innocence.  However, because this is a civil matter, Plaintiff must prove that Defendant Miller acted without probable cause at the time of Plaintiff's arrest and that he has not met his burden.  The Court agrees.

With respect to search warrants, the Fourth Amendment demands "[n]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  The Fourth Amendment protects a person's pretrial liberty interest "by ensuring that any arrest or physical incarceration attendant to a criminal prosecutions is reasonable." *Becker v. Kroll*, 494 F.3d 904, 919 (10th Cir. 2007).  Probable cause requires "reasonably trustworthy information" as "to warrant a prudent man in believing that the [arrestee has] committed or [is] committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Probable cause, however, does not require "an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 245 (1983).   It is irrelevant to the determination of probable cause whether a person is later acquitted of the crime for which he is arrested. *Michigan v. DeFillippino*, 443 U.S. 31, 36 (1979).

A police officer may be entitled to qualified immunity if probable cause exists to effect a search or arrest ***and*** absent a showing that a reasonable police officer in the same position would have known that he had failed to establish probable cause. *Malley v. Briggs*, 475 U.S. 335 (1986). The standard as articulated by *Wood v. Strickland* is whether a police officer "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate

[the person's] constitutional rights[.]"[10] 420 U.S. 308, 322 (1975). Thus, if an officer acts with probable cause, he is protected by qualified immunity even if it is later discovered that the citizen is innocent. *Henry v. United States*, 361 U.S. 98, 102 (1959).

The critical issue in this case is whether Defendant Miller had probable cause to obtain the warrants. *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004). To make this probable cause determination, the Court must inquire into what a "reasonable police officer" would have thought based on the facts presented to him, and then decide whether a reasonable officer in the same position would have reasonably believed probable cause existed. Accordingly, the Court must consider the "totality of the circumstances" to determine whether a warrant is supported by probable cause. *Illinois*, 462 U.S. 213.

Plaintiff maintains Defendants failed to properly investigate and corroborate the accusations made by the three women before arresting Plaintiff. Plaintiff contends that there were several inconsistencies in the victims' statements that should have alerted Defendants to Plaintiff's innocence. Plaintiff concludes the Police Officer Defendants' failure to realize the inconsistencies and, ultimately his innocence, results in a violation of his constitutional rights.

---

[10] A person's Fourth Amendment rights are violated if in an arrest warrant affiant "knowingly, or with reckless disregard for the truth," includes false statements in the affidavit. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (*quoting Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). Plaintiff does not charge Defendant Miller with knowingly or recklessly including false statements in the affidavits for the arrest or the search warrants. Furthermore, there is no evidence, nor does Plaintiff allege that Defendant Miller included false statements in any of the arrest or search and seizure affidavits.

### 1. Plaintiff's Prostate Surgery

Plaintiff begins by explaining that on April 21, 2006 he had undergone a radical retropubic prostatectomy. According to an affidavit provided by Plaintiff's doctor, "[a] man, after having said procedure, is capable of having an erection" but "[i]t is impossible to an absolute degree of medical certainty . . . to ejaculate semen[.]" Doc. 21–1, *Affidavit of David R. Chavez, M.D.* The only fluid a man who has had this type prostate surgery "could potentially ejaculate during a dry orgasm would be urine." *Id.* Plaintiff relates to the Court that shortly after his prostate surgery, Defendant Miller and Deputy Elder were sent out to conduct a welfare check on Plaintiff at his residence. Plaintiff emphasizes that at that time he informed the officers that he recently had undergone the prostate surgery. Plaintiff believes this information is important to the issue of probable cause because his inability to ejaculate undermines each of the three alleged victims' allegations of sexual assault.

During her interview at the Wyoming Behavioral Institute, D.S. told Deputy Elder that Plaintiff had ejaculated a white fluid during the sexual encounters he had with her. D.J. had also told Defendant Miller that Plaintiff had ejaculated semen in her mouth and that some of the semen fell on her shirt, the bed sheet, or Plaintiff.[11] Finally, T.S. had claimed Plaintiff ejaculated something warm and salty with lumps into her mouth, which caused her to vomit all over his living room floor.

---

[11] Plaintiff points out that his bed clothes were seized during the search warrant executed on August 4, 2009. Cutouts from D.J.'s shirt, jeans, and bra were also taken and submitted to the Wyoming Attorney General, Division of Criminal Investigation (DCI) for DNA testing. In March 2010, approximately six months after Plaintiff's arrest, the DCI issued a report indicating the presence of spermatozoa on the cutout of D.J.'s bra and excluded Plaintiff as a contributor. Doc. 31, Exhibit No. 6, *DCI Laboratory Examination Reports* dated March 1, 2010 and March 4, 2010.

Doc. 1, at 16, ¶¶ 82-83. Plaintiff believes Defendant Miller should have known that the victims had been untruthful since Plaintiff informed him of his prostate surgery during the welfare check. Plaintiff infers that because of the welfare check, conducted sometime in the spring of 2006, Defendant Miller had known, or should have known, that Plaintiff is unable to ejaculate semen. According to this reasoning, the victims' descriptions of his ejaculations of semen should have caused Defendant Miller to be suspicious and investigate further into the claims. The Court is not persuaded.

First, the welfare check on Plaintiff occurred over three years prior to the allegations brought by D.S. Plaintiff does not suggest there was anything notable about the 2006 welfare check that would suggest Defendant Miller should have remembered the encounter. Second, assuming Defendant Miller did remember the 2006 welfare check on Plaintiff, there is no indication that Plaintiff informed Defendant Miller at that time that his prostate surgery made it impossible to ejaculate semen. As the Police Officer Defendants point out, Defendant Miller was not obliged to fully investigate into Plaintiff's sexual limitations, nor should he "be charged with the expertise of surgeons." Doc. 21 at 20. Police officers cannot be expected to know, nor is it common knowledge, that a man who has undergone prostrate surgery or even a radical retropubic prostatectomy is unable to ejaculate semen. This knowledge limitation is precisely why Plaintiff's doctor was required to provided the affidavit explaining that it is impossible for Plaintiff to ejaculate semen. Consequently, there is no reasonably identifiable nexus between Plaintiff's prostate surgery, making it impossible for him to ejaculate semen, and Defendant Miller's knowledge of Plaintiff's sexual limitations.

18

"Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit* Authority, 124 F.3d 123, 128 (2nd Cir. 1997) (*citing Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)).

The Court finds that regardless of Plaintiff's prostate surgery, given the statements provided by three separate victims, a reasonable police officer could believe probable cause existed to support charging and arresting Plaintiff for the alleged sexual assaults. Besides, "[t]he concept of probable cause [itself] leaves room for mistakes, provided always that they are mistakes that could have been made by a reasonable officer." *Anderson v. Creighton*, 483 U.S. 635 (1987).

### 2. Items Not Found in the Search of Plaintiff's Property

Plaintiff next presents arguments against the validity of the search warrants. Plaintiff argues that because certain items that would have corroborated D.S. and T.S.'s statements were not found during the execution of the search warrants, Defendants should have known that the search warrants were based on false information and should have been able to further deduce his innocence. For this reason, Defendant believes probable cause was lacking.

D.S. told Deputy Elder that Plaintiff forced her to pose nude for him, watch pornographic videos, and look at magazines depicting other nude children. Doc. 1, ¶ 27. Yet, during the execution of the search warrant, although the police seized multiple cameras, cell phones, and video tapes, they did not find any physical evidence that would support D.S.'s claims. *See State of Wyoming v. Phillip Barham*, August 19, 2009 before Preliminary Hearing Audio Recording at approximately 27:30.

Additionally, T.S. had unequivocally indicated that Plaintiff had used a handgun during the sexual assault on her. Despite her allegation, no gun or other firearm was found during the execution of any of the searches of Plaintiff's property. Doc. 1, ¶ 170. *State of Wyoming v. Phillip Barham*, *August 19, 2009 before Preliminary Hearing Audio Recording* at approximately 32:00.

The Court finds that because all of the items described by D.S. and T.S. were not found during execution of the search warrant, this in and of itself, does not vitiate probable cause. Warrants for search and seizure of property must be supported by probable cause. U.S. Const. amend IV. Notwithstanding the need for probable cause, there is no requirement that every item described in the warrant be found in order to establish probable cause. Just as the Supreme Court held with regard to an arrest warrant:

> if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if the officers of reasonable competence could disagree on this issue, immunity should be recognized . . . Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost.... [The question] is whether a reasonably well-trained officer [] would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

*Malley v. Briggs*, 475 U.S. 335, 341, 344 (1985).

Thus, the issue is not whether the Police Officer Defendants were able to locate all of the items listed in the search warrant, but whether probable cause existed to conduct each search. Probable cause is dependant upon what the Police Officer Defendants knew or reasonably believed at the time the searches were commenced. The Court has already found that in obtaining the

warrants Defendant Miller reasonably relied on the statements provided by the three victims. Thus, based on these statements alone, probable cause was established at the commencement of the search. *Infra* Alleged Victims' Credibility at 22–23. Additionally, in reviewing Defendant Miller's testimony given at Plaintiff's August 19, 2009 preliminary hearing, the Court is *au courant* that further corroboration existed to back the alleged victims statements.[12] *State of Wyoming v. Phillip Barham*, *August 19, 2009 before Preliminary Hearing Audio Recording* at approximately 27:00 – 33:00.

### 3. Alleged Victims' Credibility

Plaintiff also attempts to call into question the three victims' credibility. Plaintiff reasons certain false and inconsistent statements given by the three alleged victims would have caused a reasonable person to question whether Plaintiff had actually committed the offenses for which he was accused.

As to D.S., Plaintiff stresses that she received counseling, wherein she had identified eight people who had allegedly sexually abused her. Doc. 1, ¶¶ 41–44. Yet, during these counseling sessions, she never mentioned Plaintiff. *Id.*, ¶¶ 45–46.

---

[12] At Plaintiff's August 19, 2009 preliminary hearing, Defendant Miller testified that during the execution of the search warrant of Plaintiff's residence, police officers confirmed that the video and photos of D.J. found on Plaintiff's phone were consistent with the cellar of Plaintiff's house. *Id.* at approximately 27:00. Moreover, D.J. voluntarily provided the clothing that she claimed Plaintiff's semen spilled on for DNA testing. *Id.* The officers also found bed sheets and a jar of Vaseline as described by D.J. or T.S. *Id.* at approximately 31:30. The Court notes that Plaintiff's counsel specifically inquired at the hearing, and Defendant Miller admitted, that the brown couch and handgun described by T.S. were not found in the search. *Id.*

Plaintiff further sets forth that he lost his lower left leg in an accident "at a youthful age" and, as a result, wears a prosthetic limb. *Id.*, ¶¶ 35–36. During D.S.'s initial interview with Deputy Elder, when asked if she had ever seen Plaintiff's legs, D.S. stated that she had and that Plaintiff had hairy calves. *Id.*, ¶ 37. During a later interview with D.S., on November 18, 2009, she was asked if she had seen Plaintiff nude. *Id.*, ¶ 38. D.S. answered that she had and described Plaintiff's body as being "wrinkled" with "lots of scars." *Id.*, ¶ 39. Yet, D.S. failed to mention a prosthetic limb. Plaintiff insists the Police Officer Defendants were aware of his prosthetic limb during both interviews. *Id.*, ¶¶ 36, 40. Since a prosthetic limb is anomalous, Plaintiff believes the lack of its mention during the interviews should have stood out to the Police Officer Defendants. Plaintiff concludes that because D.S.'s descriptions of Plaintiff were wrong, this should have raised red flags with the Police Officer Defendants, and from this they should have surmised Plaintiff's innocence.

Plaintiff further insists D.J.'s credibility was "highly questionable" because of the time frame she provided for being at his house. *See* Doc. 1, ¶¶ 122–137. Plaintiff explains that D.J. was at his house for less than one hour, and alone with Plaintiff for less than half of that time. According to evidence gathered by Plaintiff's private investigator and attorney, most of D.J.'s time at his house can be accounted for, leaving little to no time for the alleged sexual assault.[13] During the time the sexual assault allegedly occurred, a neighbor saw D.J. out in Plaintiff's yard walking around or standing on the curb while Plaintiff was driving his tractor down the alley in the opposite direction.[14]

---

[13] The Court notes this evidence was gather after Plaintiff's arrest.

[14] Again this is evidence gathered after Plaintiff's arrest.

*Id.*, ¶¶ 130–132. Additionally, cell phone records establish that D.J. spent approximately fourteen (14) minutes on her cell phone, at which time she sent two semi-nude photographs of herself to Plaintiff. *Id.*, ¶¶ 126–129. Based on this information, Plaintiff concludes there was no time for the sexual assault to occur.

As to T.S.'s statements, Plaintiff simply alleges the police "failed to make an adequate and complete investigation of the unsubstantiated and un-corroborated accusations of T.S., all of which were false as to any alleged criminal act committed by Plaintiff." Doc. 1, ¶ 89.

The Court finds Plaintiff's reasoning to be flawed. To begin with, Plaintiff has not cited a single case, nor is the Court aware of one, holding that a police officer cannot rely on the statements of alleged victims obtained during personal interviews to establish probable cause. To the contrary, the Tenth Circuit has held that the uncorroborated statements of a victim are sufficient to establish probable cause. *Munday v. Johnson*, 257 Fed.Appx. 126, 131 (10th Cir. 2007). *See also Easton v. City of Boulder*, 776 F.2d 1441, 1449-50 (10th Cir. 1985) (holding statements of an alleged victim or witness, even a minor child, can be sufficient to establish probable cause to support the issuance of a warrant); *Guzell v. Hiller*, 223 F.3d 518, 519-20 (7th Cir. 2000) ("Police are entitled to base an arrest on a citizen complaint . . . of a victim . . . without investigating the truthfulness of the complaint, unless . . . they have reason to believe it's fishy.").

The Court finds the alleged victims' descriptions of Plaintiff's residence and property, both inside and out, were corroborated by Defendant Miller and other police officer's investigations of the claims against Plaintiff. During the execution of the search warrants, the police officers

determined that the descriptions were substantially accurate. *State of Wyoming v. Phillip Barham*, *August 19, 2009 before Preliminary Hearing Audio Recording* at 42:20. Moreover, the affidavits include sufficient and specific facts that demonstrated a substantial probability that Plaintiff sexually assaulted the women. There are additional indications that would have led a reasonable police officer to believe he had probable cause at the time the warrants were swore out, including the video and photos of D.J. found on one of Plaintiff's cell phones and Defendant Miller's personal observation of the bruises on D.J. that were consistent with her statements. At Plaintiff's preliminary hearing, after listening to the testimony of Defendant Miller regarding the statements of the victims and the returns on the search warrants, the circuit court judge also found probable cause existed and bound Plaintiff over to the district court. *Id.* at 42:20. This independent determination by a neutral and detached judge further substantiates the probable cause determination. *Illinois v. Gates*, 462 U.S. at 236 ("A search warrant comports with the Fourth Amendment if it was issued by a "magistrate [who] had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing . . .") (citation omitted).

To that end, based on statements provided by three independent women, Police Officer Defendants reasonably believed they had probable cause to arrest Plaintiff and search his property. Accordingly, the Court finds, even viewing the evidence in the light most favorable to Plaintiff, he has failed to present specific facts creating a genuine issue as the whether the Police Officer Defendants' reliance of the three victims states and belief in the truth of these were not reasonable to establish probable cause.

### 4. Interview with Winstead

Plaintiff also advances that Defendant Miller interviewed D.S.'s great uncle, Winstead, at the Wyoming State Penitentiary on August 12, 2009. Doc. 1 at 10, ¶¶ 47 - 48. During the interview, Winstead allegedly told Defendant Miller that although he had taken D.S. to Plaintiff's house to pick tomatoes from Plaintiff's garden, he never introduced D.S. to Plaintiff. *Id.* Later, on November 3, 2009, Plaintiff's private investigator again interviewed Winstead. During this interview, Winstead stated "[h]e never told the minor that it was alright to have sexual intercourse with [Plaintiff, nor] did he ever observe [Plaintiff] having sexual intercourse with a minor." Doc. 1, at 11, ¶ 50. Plaintiff argues that this information was available to Defendant Miller and provided reasonable doubt as to Plaintiff's guilt.

The Court finds that at the time of Plaintiff's arrest, there is no indication that the Defendant Police Officers acted without probable cause. Although Winstead's statements may provide reasonable doubt as to Plaintiff's guilt, it does not vitiate probable cause. Moreover, Winstead's interviews did not occur until after Plaintiff's arrest. In *Baker v. McCollan*, 443 U.S. 137, (1979), the Court held that a sheriff who held a prisoner in custody pursuant to a valid arrest warrant was under no duty to investigate the prisoner's claim of innocence. *See also Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2nd Cir. 1997) (noting that once an officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence). Consequently, once the Police Officer Defendants had sufficient facts to establish probable cause, there was no obligation to conduct further investigation to find

potentially exculpatory evidence. *See e.g. Romero v. Fay*, 45 F.3d 1472, 1476-78 (10th Cir. 1995) (officer entitled to qualified immunity even though he did not investigate alibi because no evidence of deliberate or reckless intent). Therefore, the Court finds Defendant Miller's post-arrest interview with Winstead does not affect the Court's determination of qualified immunity.

### 5. The Court's Findings on Plaintiff's Fourth Amendment Claims

Remaining mindful that the fundamental issue here is what Defendant Miller and the other Greybull police officers knew at the time they arrested Plaintiff, the Court finds Defendant Miller's affidavits establish probable cause to believe that Plaintiff committed sexual assaults against the three separate victims. Here, the inconsistencies cited by Plaintiff do not undermine the statements of three separate alleged victims. "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

The exculpatory facts cited by Plaintiff may provide reasonable doubt as to Plaintiff's guilt, but they do not vitiate probable cause for the warrants at the time of his arrest. Proof beyond a reasonable doubt is required for a conviction but, as is the case here, only the lesser standard of probable cause is required for an arrest. In *Illinois v. Gates*, the Supreme Court explained:

> As early as *Locke v. United States*, 7 Cranch 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context: '[T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation . . . It imports a seizure made under circumstances which warrant suspicion.' '[T]he quanta ... of proof' appropriate in ordinary judicial proceedings

are inapplicable to the decision to issue a warrant [meaning] [f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision."

*Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)) (internal citations omitted). This is because twenty-twenty hindsight giving rise to evidence of Plaintiff's innocence does not also give rise to a § 1983 action.[15]

Assuming, *arguendo*, that Plaintiff was arrested without probable cause, Defendants may be entitled to qualified immunity if their conduct "'[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Person v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). The Court finds the Officer Defendants are entitled to qualified immunity because reasonable officers in their position could have believed that the victims' statements established probable cause. Meaning, if Defendant Miller was mistaken in his belief that probable cause had been established, the mistake was reasonable.

For the reasons set forth above, the Court finds Plaintiff has not met his burden showing Police Officers Defendants violated his constitutional rights. Accordingly, the Police Officer Defendants are entitled to qualified immunity with regard to Plaintiff's Fourth Amendment claims

_____

[15] Plaintiff makes an argument that because the Wyoming Attorney General's Division of Criminal Investigation determined that the spermatozoa found on D.J.'s bra did not be did not match Plaintiff's DNA, probable cause could not have been established. Doc 30-1, Exhibit No. 6. These laboratory results are dated March 1, 2010 and March 4, 2010. The District Court Judge released Plaintiff five days afterwards and dismissed any remaining charges against Plaintiff, presumably because of the test results. However, this fact in no way alters what was known at the time of the warrant, which evidenced probable cause. Thus, it does not affect the Court's determination here.

for unlawful arrest, unlawful detention, and unlawful search and seizure.

### (c)      CONVERSION OF PLAINTIFF'S PROPERTY

Plaintiff's claim for unlawful search and seizure also include allegations that Police Officer Defendants have failed to return all of his property. In executing the search warrants on Plaintiff's property, the police officers seized numerous articles of Plaintiff's personal property. Doc. 1, ¶¶ 159–169.[16] When Plaintiff was released, Police Officer Defendants returned the seized property and indicated it was all of the property they had seized. *Id.*, ¶ 171. Plaintiff asserts he later discovered that Defendants failed to return all of his property. *Id.*, ¶ 173. Plaintiff's attorney has written letters to the Greybull Police Department seeking the return of Plaintiff's property, to no apparent avail. Doc. 21–12, Exhibit L, at pp. 6–9. Additionally, the state district court entered an order to show cause as to why Police Officer Defendants "should not be held in contempt of this court for [their] failure to comply with the Court's Order entered March 9, 2010, ordering that any property seized from the defendant during the investigation of this matter be returned[.]" *Id.*, at 10. Plaintiff insists that Defendants are unable to return his personal property because it was not properly marked or identified. *Id.*, ¶¶ 160, 165, and 172.

As far as the Court is able to determine, this is a claim for conversion and damage to personal property, which falls under state law. Under Wyoming state law, "'[c]onversion occurs when a person treats another's property as his own denying the true owner the benefits and rights of

---

[16] The Police Officers also allegedly destroyed a Barbie doll belonging to Plaintiff's daughter. *Id.*, ¶ 158.

ownership.'" *Alcaraz v. State*, 44 P.3d 68, 71 (Wyo. 2002) (*quoting Cross v. Berg Lumber Company*, 7 P.3d 922, 929 (Wyo. 2000)). Pursuant to 28 U.S.C. § 1367, the Court declines to exercise supplemental jurisdiction over this claim since "the claim substantially predominates over the claim . . . over which the [] court has original jurisdiction." 28.U.S.C. § 1367(c). The Court finds this issue is better adjudicated by the state court since that court is fully advised of the issue and has already issued an order to show cause. Therefore, any claim for conversion is dismissed, without prejudice.[17]

    **(d)    PUBLIC EMBARRASSMENT, RIDICULE, & LOSS OF ENJOYMENT OF LIFE**

Plaintiff also alleges Defendants violated his civil rights by destroying his reputation. Plaintiff explains that because of the charges filed against him, he "has been branded as a child molester, a rapist, and a sexual pedophile" and that he has received threats, including death threats, to such a degree that he has been forced to relocate from Greybull, Wyoming. Doc. 1, ¶¶ 198, 201 Plaintiff further explains that, for his own safety, he was forced to spend most of his 224 days of incarceration in solitary confinement. *Id.*, ¶ 199. Further, while incarcerated, Plaintiff became delinquent in his financial obligations. Since his release, he has been forced to sell real estate and mortgage his house in order to pay his legal fees and other bills. *Id.*, ¶¶ 202-204. Plaintiff's vegetable garden, a source of "great pride," has been left to ruin. *Id.*, ¶¶ 205-208. Because of the

---

[17] During the May 11, 2011 hearing, Plaintiff's counsel stated that the claim of conversion was included in his Complaint simply to support and illustrate his allegations that Defendant Police Officers were incompetent, in support of his Fourth Amendment claims, in as much as they could not even keep track of the evidence gathered under the search warrants.

stigma associated with the charges, Plaintiff has lost the esteem of friends and colleagues, his fiancé left him, and his three dogs have disappeared. *Id.*, ¶¶ 209-215.

The Court finds Defendants' are not liable for Plaintiff's unfortunate losses. A finding of an underlying constitutional violation is necessary before a plaintiff can recover damages for public embarrassment, ridicule, or loss of enjoyment of life. This is because actual injuries must be shown. *See generally Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986); *Farrar v. Hobby*, 506 U.S. 103 (1992); *Jolivet v. Deland*, 966 F.2d 573 (10th Cir. 1992); *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1558 (10th Cir. 1993) ("Damage to one's reputation alone . . . is not enough to implicate due process protections."). Because the Court has found that the Police Officer Defendants are entitled to qualified immunity, based on a showing of probable cause, there is no underlying constitutional violation upon which Plaintiff can support his claim for public embarrassment, ridicule, or loss of enjoyment of life. Consequently, there is no genuine issue of material fact and as a matter of law, Defendants are entitled to judgment in their favor under Count IV of Plaintiff's Complaint.

### (e) PLAINTIFF'S CLAIM FOR EXCESSIVE FORCE[18]

Plaintiff claims that the Police Officer Defendants used excessive force on him at the time of his arrest, in violation of his § 1983 civil rights. During his arrest, Defendant Mayland handcuffed Plaintiff's hands behind his back. Doc. 1, ¶ 186. Very shortly thereafter, Defendant Miller "re-

---

[18] Defendant Miller has not moved for summary judgment on Plaintiff's claim for excessive force. Nonetheless, a police officer accused of using excessive force may be entitled to qualified immunity if his conduct was objectively reasonable. *Graham v. Connor*, 490 U.S. 1865 (1989).

cuffed [his] hands behind his back and forcefully jerked [his] cuffed hands and arms upward with such force that Plaintiff immediately experienced severe pain in his left shoulder." *Id.* Defendant Miller also shackled Plaintiff's ankles, using enough force that Plaintiff's left leg prosthesis came off. *Id.*, ¶ 187. Plaintiff states that because of this incident, he has continually experienced severe pain in his left shoulder. *Id.*, ¶¶ 188–191. Upon his release from the Big Horn County Detention Center, Plaintiff was diagnosed as having a "full-thickness rotator cuff tear" in his shoulder that will require surgery to repair. *Id.*, ¶¶ 189–190.

Individuals have a right under the Fourth Amendment to be free from excessive force when police make an arrest or seizure. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). However, as pointed out by the Police Officer Defendants, Plaintiff has not alleged that Defendant Brenner or Defendant Mayland used excessive force against him during his arrest or facilitated the use of excessive force against him. Viewed in a light most favorable to Plaintiff, there is no evidence that either Defendant Brenner or Defendant Mayland touched Plaintiff beyond Defendant Mayland initially handcuffing him, or that either were present at the time Plaintiff was injured. Accordingly, the Court finds there is no genuine issue of material fact. Consequently, there is no viable excessive force claim against Defendant Brenner or Defendant Mayland. Nonetheless, Plaintiff's claim for excessive force against Defendant Miller shall remain, as it is not part of Police Officer Defendants' motion.

**(f)    LIABILITY OF DEFENDANTS TOWN OF GREYBULL, WYOMING and GREYBULL POLICE DEPARTMENT**

The Court next turns to Plaintiff's claims against the Town of Greybull, Wyoming and the Greybull Police Department. Only one paragraph of the Complaint is directed at these Defendants: "The Town, the Police, and Brenner as Chief of Police, failed to provide adequate supervision, training, discipline over the law enforcement officers under their command which resulted in the violation of Plaintiff's civil rights." Doc. 1, ¶ 147.

Plaintiff fails to allege any facts supporting his claim of inadequate supervision, training, or discipline over Defendant Police Officers. To survive a motion to dismiss a plaintiff must allege enough facts to state a claim to relief that is plausible on its fact. *See Bell Atlantic Corp. V. Twombly*, 550 U.S. 544, 570 (2007) (at motion to dismiss stage complaint need not provide detailed factual allegations, however plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do). As set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, the Court held "that a municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. 658, 691 (1978) (emphasis in original). As a consequence, a plaintiff seeking to impose liability against a government entity under § 1983 must show that a policy or custom caused the plaintiff's injury. *See Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997). Because Plaintiff did not allege that a policy or custom caused his injury, the Court is not able to find a

genuine issue of material fact exists.

Regardless, because there is no underlying violation, the Court finds these Defendants are not liable for any of Plaintiff's claims. The Tenth Circuit has specifically held that a county cannot be held liable for constitutional violations if there is no underlying constitutional violation by any of its officers. *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (*quoting Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002)). In *Martinez*, the plaintiff, suing on behalf of her father's estate, brought 42 U.S.C. § 1983 claims against the Board of County Commissioners of Cleveland County Oklahoma, certain police officers, and the county sheriff after her father died in the county jail a few hours after his arrest for public intoxication. *Id.* at 1084. The plaintiff argued her father died because of the defendants' deliberate indifference to his medical needs. *Id.* The district court granted summary judgment on behalf of the defendants on qualified immunity grounds, which was upheld by the Tenth Circuit. *Id.* As for the claims against the sheriff and the county, the Tenth Circuit specifically held that since it "concluded the individual [officers] did not violate Ginns' constitutional rights, [the sheriff] and the county cannot be held liable in this matter." *Id.* at 1092.

The Court finds that the *Martinez* holding is material to Plaintiff's claims against the Town of Greybull, Wyoming and the Greybull Police Department in this case. Because the Court finds the Police Officer Defendants had probable cause to arrest Plaintiff and search his property, therefore Plaintiff's constitutional rights were not violated. It follows that the Town of Greybull, Wyoming or the Greybull Police Department cannot be held liable where a constitutional violation was not

committed. Moreover, Plaintiff fails to point to any policy or custom espoused by either of these Defendants that was violative of his rights. Therefore, because Plaintiff has created no genuine issue of material fact as to the these Defendants' policies, practices, or customs, the Court finds that summary judgment is appropriate.

### (g) PUNITIVE DAMAGES

Plaintiff finally seeks an award of punitive damages. Doc. 1, ¶¶ 218–220. Pursuant to Wyoming state law, "[p]unitive damages are not intended to compensate the plaintiff; instead, punitive damages are awarded to punish the defendant and deter others from such conduct in the future." *Alexander v. Meduna*, 47 P.3d 206, 217 (Wyo. 2002). A claims for punitive damages is an element of a cause of action, not a separate cause of action. *Errington v. Zolessi*, 9 P.3d 966, 969 (Wyo. 2000). Therefore, a claim for punitive damages in this case cannot stand without an underlying constitutional violation.

The Court finds that based on Wyoming's public policy of awarding punitive damages, and because the Court finds there to be no underlying constitutional violations for which ta genuine issue of material fact exists, it appropriate to dismiss Plaintiff's claim for punitive damages against Defendants Town of Greybull, Wyoming, the Greybull Police Department, Police Chief Bill Brenner, and Officer Ben Mayland, as there is no sufficient bases to warrant an award of such. *Accord Cook v. Shoshone First Bank*, 126 P.3d 886, 897 (Wyo. 2006) (holding "[s]ummary judgment on the underlying claims effectively disposed of the punitive damages claim and no further discussion is necessary.").

34

Because Plaintiff's claim of excessive force against Defendant Miller remains, the Court is unable to find that Plaintiff is not entitled to punitive damages on that claim. Since an issue of material fact exists as to whether Defendant Miller's conduct rises to the level to support punitive damages, the Court finds summary judgment for Defendant Miller is not appropriate.

## IV.    CONCLUSION

With the exception noted below, the Court concludes that Plaintiff has not met his burden to establish Defendant Police Officers violated his constitutional rights. Consequently, there are no genuine issues of material fact and Defendants are entitled, based upon qualified immunity, to judgment on Plaintiff's claims for: (1) unlawful arrest and unlawful detention in violation of his civil rights, pursuant to 42 U.S.C. § 1983; (2) unlawful search and seizure; (3) excessive force causing physical injury during arrest against Defendants Brenner and Mayland; and (4) public embarrassment, ridicule, and loss of enjoyment of life. The Court also concludes it is appropriate to dismiss Plaintiff's claim for punitive damages against Defendants Town of Greybull, Wyoming, the Greybull Police Department, Police Chief Bill Brenner, and Officer Ben Mayland. Having disposed of Defendants' motions for summary judgment, only Plaintiff's claim for excessive force, including his claim for punitive damages, against Defendant Miller remains for trial. Counsel shall request a scheduling conference to place this matter back on the trial calendar.

NOW, THEREFORE, IT IS ORDERED that *Peace Officer Defendants' Motion for Judgment on the Pleadings* be, and the same is hereby GRANTED as set forth herein. It is

FURTHER ORDERED that *Motion for Judgment on the Pleadings Pursuant to Rule 12(c),*

*Fed.R.Civ.P. by Defendants Town of Greybull, Wyoming and Greybull Police Department* be, and

the same is hereby GRANTED as set forth herein.

Dated this __11th__ day of July, 2011.


_____
Scott W. Skavdahl
UNITED STATES MAGISTRATE JUDGE